## Andrew v. Andrew, Appellant.

Argued December 11, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*William W. McKendry*, with him *Clinton A. Sowers*, for appellant.

*Charles Edwin Fox*, with him *I. Nathaniel Treblow*, for appellee.

OPINION BY PARKER, J., January 31, 1936:

In this action of divorce the husband charged his wife with cruel and barbarous treatment and indignities to the person such as to render his condition intolerable and life burdensome. The master appointed to take the testimony of witnesses recommended that a decree be refused the libellant. Exceptions to the master's report were sustained and the court below granted a divorce on the ground of indignities to the person.

After a review of the evidence by this court, as is required in a case of this character, we are of opinion that libellant is entitled to a decree. The master and court below were in agreement that the conduct of the respondent toward the libellant constituted indignities as that term is used in our divorce laws, but the master was of the opinion that the conduct of the respondent of which her husband complains was provoked by the

husband and that he was not an "injured and innocent spouse." This presents the real issue in the case.

We will not enter into the details of the evidence gleaned from an examination of the voluminous record and tending to show the indignities visited upon the libellant by the respondent except insofar as the facts have a bearing on the question of provocation. Suffice it to say that the conduct on the part of the respondent manifested a settled hatred of and estrangement from the libellant consisting of nagging, the use of abusive language, calling him vile names, continuous charges concerning his running around with other women made to third persons as well as himself and wholly unsupported by proofs, charges that he had been intimate with young girls, frequent attempts to humiliate and embarrass him in his business finally resulting in violent outbursts reiterating such charges in the presence of his employees—sufficient to warrant a decree in his favor if his conduct did not amount to such provocation as would defeat such right. (Mullen v. Mullen, 115 Pa. Superior Ct. 300, 175 A. 710.)

The parties were married in 1917, the wife being four years the senior of her husband, and had two children, aged twelve and fourteen years at the time of the hearing. For a short time after their marriage the parties lived together without serious disruption of their marital relations. The husband engaged with his brother in operating an automobile garage and repair shop and appears to have had a struggle to make ends meet. During this time the wife secured employment and contributed materially to the financial support of the family in addition to performing her duties as a housewife and mother. While the husband was engaged in the automobile business the wife became suspicious of his conduct toward a girl employed in the garage part time as a bookkeeper and, although there was no evidence of any improper conduct upon the part of the

libellant, he found it necessary in the interest of domestic harmony to discharge that employee. The husband, seeking a more profitable employment became interested in the insurance business and engaged as an investigator, adjuster of losses, and salesman. During this time, the wife's suspicious disposition developed into unreasoning jealousy and she indicated a settled hatred and estrangement from the libellant by constant quarreling, nagging, and the use of abusive language in the presence of third parties wherein she accused him of immorality, charged him with failing to support the family, and called him such names as "whoremaster". The libellant, in connection with his insurance business, found it necessary to employ several girls in his office. The wife, in addition to charging her husband in the presence of strangers and of their children with running around with other women and with immoral conduct, made frequent trips to his office where these charges were publicly made. Her outbursts of jealousy and rage reached their climax on some of these visits. On one occasion, on coming into the office she said to the girl employees that events occurred by threes; that two girls who had worked in her husband's office had become pregnant; that in one case the girl had died; that in the other case the baby had died, and suggested that this experience be remembered as a warning. On another occasion, she burst into his private office where he was engaged in conversation with another man and, after some violent displays of temper and the use of objectionable language, broke the glass in the door of his office. On another occasion she called one of the girls in the office a liar when the employee informed her that her husband was not in. At another time, after a display of temper, she attempted to jump out of a window from a high story of the office building. There was considerable corroboration of the libellant's testimony not only by the employees in his office but

to some extent by others. While the respondent categorically denied most of these charges, she made a number of admissions which indicated quite clearly the fact that she had exceeded all reasonable bounds in the manner in which she had acted on these visits to her husband's place of business.

Counsel for the respondent, in support of his position that the respondent's conduct was provoked by the husband, depended for proof almost exclusively upon an event which occurred in 1931. A young woman who was expert in taking down statements of witnesses and securing their signatures thereto was engaged by libellant to assist him in the taking of such evidence. In January, 1931, the libellant was directed by his home office to secure the written statements of certain witnesses who resided in Trenton, New Jersey. In company with this young woman, he went to Trenton in his automobile in the late afternoon and during the early evening procured several statements which were produced in evidence and authenticated by the personal presence and testimony of at least one of the witnesses on the hearing of this cause. On their return and while on the Roosevelt Boulevard they were held up by bandits and the girl was shot through her right arm and the libellant was wounded in one of his hands. They immediately reported the crime to one of the park guards and were taken to a hospital. The city policemen in the meantime investigated the affair and conceived the idea that either the libellant or his companion had done the shooting. They developed this theory from the fact that the libellant had in his car a revolver which had been discharged. The libellant claimed that the revolver was discharged at the bandits. However, it subsequently appeared by unquestionable proof that they had been held up, for the bandits were apprehended, confessed, and were convicted. The city policemen detained the libellant in custody until the

following afternoon and placed the young lady under restraint. He was not released until the following afternoon when he states that he immediately told all of the facts in connection with this affair to his wife in the presence of witnesses, while she maintains that she first learned of it through a lurid description in a local paper. The wife, in company with a witness, immediately went to the hospital and interviewed the young lady. The wife and her companion state that in the course of this interview the young lady stated that she loved respondent's husband. This, however, was very positively denied by the employee.

Undoubtedly the circumstances were such that the wife was entitled to a full explanation from her husband. This he states he gave her, and here there is a sharp contradiction in the testimony. Notwithstanding the husband's insistence upon his innocence and the fact that the wife was unable to furnish a shred of testimony aside from this occurrence which indicated that there were any improper relations between the libellant and his woman employee, the wife employed a detective to shadow him and investigated his conduct at all opportunities but was unable to point to a single instance which would indicate immoral conduct upon the part of her husband. Notwithstanding these facts, the vehemence of her verbal attacks upon her husband increased. Her charges were not confined to such as might have been made to the husband or his immediate family but were made in the presence of strangers, his office employees, and others, not upon isolated occasions but frequently. In addition, she interfered with the business of the defendant by interrogating and cross-examining clients who called the libellant by telephone at his home. This was without warrant on any theory of the case.

"Indignities provoked by the complaining parties are of course no ground of divorce, unless when the retalia-

tion is excessive": Richards v. Richards, 37 Pa. 225, 228; Conrad v. Conrad, 112 Pa. Superior Ct. 198, 200, 170 A. 342; Manzi v. Manzi, 112 Pa. Superior Ct. 332, 171 A. 92; Kerr v. Kerr, 115 Pa. Superior Ct. 18, 22, 174 A. 820. This case is clearly distinguished from that of Manzi v. Manzi, supra, much relied upon by respondent, where the conduct of the libellant was reprehensible and the fact of the provoking conduct was established by clear evidence. Here the circumstances were essentially different for the wife depended upon mere inference or conjecture to support a suspicion. There was not anything improper or out of the way in the libellant employing a woman in his office or even going with her in his automobile to take down the statements of witnesses. She suspected undue intimacy between her husband and the girl and if she would avoid the consequences of her violent outbursts must show facts that would warrant a reasonable inference that the relations of the employer and employee were other than those arising in transactions pertaining to the insurance business. She not only failed to sustain her suspicions by concrete facts but, although she employed a private detective to shadow her husband, was able to furnish no evidence which indicated improper intimacy. Not alone so, but the wife retaliated to a degree and in a manner that was not warranted. As we have indicated, while this occurrence justified the wife in asking for an explanation and receiving a satisfactory one, it was not proper for her, unsupported as her allegations were, to go to the office of the libellant, disrupt his business with violent language, and upbraid and condemn her husband. This conduct indicated more than the natural reaction of an injured wife. As counsel for the appellee suggests, even a jealous woman owes to her husband a duty not to misinterpret circumstances or incidents unless she is willing to bear the consequences. We are of the opinion that her conduct was

unjustified and that she exceeded all reasonable bounds in the manner in which she interfered with her husband's business.

The evidence shows a strong love upon the part of both parents for their children. For several years the libellant has been paying a weekly allowance under an order of court of fifteen dollars and, in addition, he has paid sixty-three dollars a month for the use of the house in which the wife and children live and purchased the children's clothing. He has regularly visited them and taken them with him for his and their entertainment. The wife has likewise given close attention to the care of her children and, as the master suggests, both have displayed strong attachment for their offspring. It is to be regretted that there is not a corresponding relationship of confidence and devotion between the husband and wife. We find in the testimony clear evidence of a settled hatred and contempt upon the part of the respondent for the husband displayed by outbursts of temper in public and private.

A careful examination and reading of all the testimony convinces us that the learned judge of the court below was justified in awarding a decree of divorce to the libellant.

The order of the court below granting the divorce is affirmed at the cost of the appellant.